**Patrick Brian PIERSON, Plaintiff,**

v.

**Carolyn W. COLVIN[1], Acting Commissioner of Social Security, Defendant.**

**No. 1:12–cv–20 RP–TJS.**

United States District Court, S.D. Iowa, Western Division.

April 26, 2013.

---

**1.** Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should, therefore, be substituted for Michael J. Astrue as the Defendant in this suit. No further action need to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Gary L. Hayward, United States Attorney, Des Moines, IA, for Defendant.

John W. Kocourek, John W. Kocourek PC, Council Bluffs, IA, Thomas A. Krause, Attorney at Law, Des Moines, IA, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Plaintiff, Patrick Brian Pierson, filed a Complaint in this Court on July 11, 2012, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed applications for benefits October 29, 2008. Tr. at 151–57. Plaintiff, whose date of birth is July 18, 1962, (Tr. at 151) was 48 years old at the time of the hearing on January 13, 2011, before Administrative Law Judge Ronald D. Lahners (ALJ). Tr. at 28–61. The ALJ issued a Notice Of Decision—Unfavorable on January 27, 2011. Tr. at 6–20. The Appeals Council declined to review the ALJ's decision on May 8, 2012. Tr. at 1–3. Thereafter, Plaintiff commenced this action.

After reading the briefs submitted by each of the parties, the Court believed a hearing was necessary prior to the record being completed. On April 18, 2013, the Court heard argument from counsel for Plaintiff and counsel for the Commissioner.

The ALJ noted that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2008. At the first step of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity after November 1, 2008, the amended alleged disability onset date. At the second step, the ALJ found Plaintiff has the following severe impairments: borderline intellectual functioning, hepatitis C, hemochromatosis, cirrhosis of the liver, low back pain, depression, antisocial personality disorder, anxiety, and polysubstance dependence in remission. Tr. at 11. The ALJ found that Plaintiff's impairments were not severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 12. At the fourth step, the ALJ found

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except as follows:
>
> The claimant can lift up to 20 pounds occasionally and 10 pounds frequently. In an 8–hour day he can stand for 6 hours and sit for 6 hours. He has unlimited use of his upper extremities. The claimant is limited to unskilled work as he cannot understand, remember or carry out detailed instructions. He has moderate limitations in his ability to do the following: maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; and to get along with co-workers and supervisors because he would not take criticism well. The claimant needs a position where he does not have much if any work with the general public, and he either works by himself in an area where he has minimal contact with other co-workers and limited-type interaction with supervisors.

Tr. at 14. The ALJ found that Plaintiff is unable to perform his past relevant work. Tr. at 18. At the fifth step, the ALJ found that Plaintiff is able to do a significant

number of jobs, examples of which include house cleaner, photocopy machine operator, and inserting machine operator. Tr. at 18–19. The ALJ found that Plaintiff is not disabled nor entitled to the benefits for which he applied. Tr. at 19.

At argument before the Court, counsel were asked why the sequential evaluation should not have been stopped at step three because a medical equivalence to listing 12.05C had been established. Counsel agreed with each other that deficits in adaptive functioning before age 22 had not been established. Counsel for Plaintiff pointed to a disability report on which Plaintiff indicated that he had not attended "special education" while in school. See, Tr. at 190. Also, counsel were troubled that Plaintiff's work history indicated that his impairments were not of listing level severity. These arguments will be considered below.

## EVIDENCE REVIEW

The Court has read each and every page of this voluminous record. The record shows that Plaintiff was an inmate of an Iowa State Correctional facility from September 13, 2006 until October or November 2008. Both before, during and after incarceration Plaintiff was treated for chronic liver diseases including chronic hepatitis C, hereditary hemochromatosis[2], C282Y homozygous[3] with iron overload. In order to control the iron overload, weekly therapeutic phlebotomies were necessary. Before he went to prison, as well as after he was released, the phlebotomies took place at Jennie Edmundson Hospital in Council Bluffs, Iowa. During incarceration, Plaintiff received his medical care at the University of Iowa Hospitals and Clinics. After discharge from prison, the doctors at the University of Iowa continued to see Plaintiff and to monitor his conditions, but they worked in conjunction with doctors closer to Plaintiff's home.

In addition to being treated for liver disease, he was also diagnosed with depression, anxiety, social anxiety and antisocial personality disorder. Before he was incarcerated for growing marijuana, Plaintiff had a long history of heavy drinking and drug usage. Plaintiff's medical care at the University of Iowa included evaluation of low back pain which was attributed to multilevel small herniations superimposed on what appears to be a congenitally mildly narrowed spinal canal. The record of this case also shows that Plaintiff underwent testing for pain caused by a testicle retracting into his body; rectal bleeding; and, evaluation for gall bladder disease.

After Plaintiff was released from prison, Plaintiff asked Lloyd A. Pierre, Jr., M.D. to be his primary care giver. Dr. Pierre monitored Plaintiff's laboratory reports, and reported that Plaintiff was receiving phlebotomies at Jennie Edmundson Hospital in Council Bluffs.

On January 13, 2009, Plaintiff was seen by Rosanna M. Jones–Thurman, Ph.D., for

---

**2.** A disorder of iron metabolism characterized by excessive absorption of ingested iron, saturation of iron-binding protein, and deposition of hemosiderin in tissue, particularly in the liver, pancreas, and skin; cirrhosis of the liver, diabetes (bronze diabetes), bronze pigmentation of the skin, and, eventually heart failure may occur; also can result from administration of large amounts of iron orally, by injection, or in forms of blood transfusion therapy. Stedman's Medical Dictionary, 27th Edition.

**3.** *Homozygous:* Having identical alleles at one or more loci. *Allele:* Any one of a series of two or more different genes that may occupy the same locus on a specific chromosome. As autosomal chromosomes are paired, each autosomal gene is represented twice in normal somatic cells. If the same allele occupies both units of the locus, the individual or cell is homozygous for this allele. If the alleles are different, the individual or cell is heterozygous for both alleles. Stedman's Medical Dictionary, 27th Edition.

a psychological evaluation at the request of Disability Determination Services. Tr. at 420–25. Plaintiff was driven to the appointment by his mother because he did not have a valid driver's license. Tr. at 420. Plaintiff reported a history of being sexually abused by three different babysitters. Plaintiff reported dropping out of school in the 11th grade, and stated he had been in special education. It was noted that his mother fills out all his paper work, including the forms in the psychologist's office. Plaintiff reported no current legal problems and said that he was not on probation, having been released from prison in October 2008. Plaintiff reported being sober since September 13, 2006. Before that, he drank alcohol every day. Plaintiff reported that he was not working and was applying for disability benefits. Tr. at 421. His work history consisted of basic labor and production jobs and he said he had been fired from most jobs. His longest employment was for 10 years at Airlite Plastics where he drove a forklift. Plaintiff said that while he was in prison, he was diagnosed with depression, anxiety, social anxiety and antisocial personality disorder. Plaintiff said that before he went to prison, his mental illnesses were hidden beneath his alcohol and drug problems. The doctor wrote:

> He does report anxiety, his heart beats fast, he sweats and he gets nervous about talking. He also reports he is a loner, stays in his basement, does not really socialize and has had an increase in anxiety since being sober. He feels depressed, having mood swings and mood changes. He gets angry easily, but also feels down, depressed and sorry for himself. He does report past physical aggression but states he learned some coping skills in prison. He often raises his voice but is not verbally aggressive like he was before. He reports being irritable, stating small things bother him. He is afraid of what people think about him and does not like being out in public where people look at him. He eats about one meal a day and states he really just does not have much appetite. His sleep is variable. Yesterday and the day before, he slept all day but some nights he cannot go to sleep at all. He has no suicidal ideation now, but previously had thoughts and has had two past suicide attempts. In one attempt, he shot himself in the stomach and lived through it. In the other attempt, he overdosed on pills with a combination of sleeping pills and vodka.

Plaintiff said that he lives with his grandmother, and helps her with household chores and yard work. Tr. at 422. In her conclusions, Dr. Jones–Thurman observed that Plaintiff's "overall sensorium and cognition were below average." She recommended that Plaintiff undergo IQ testing to rule out borderline intellectual functioning. Tr. at 424. On Axis I, the diagnoses were: mood disorder NOS; social anxiety disorder; alcohol dependence, cannabis dependence and amphetamine dependence— all in remission. On Axis II, the diagnoses were antisocial personality disorder, and rule out borderline intellectual functioning. Tr. at 424.

Plaintiff returned to Dr. Jones–Thurman on February 10, 2009 for further testing. Tr. at 428–31. The psychologist wrote:

> Mr. Pierson completed the Wechsler Adult Intelligence Scale—Fourth Edition (WAIS–IV)[4] and obtained a Verbal Comprehension IQ score of 80 (Low Average), a Perceptual Reasoning IQ score

4. The WAIS–IV became available in 2008, replacing the WAIS–III which became available in 1997. WAIS: A historical perspective, https://www.pearsonassessments.com/NR/ rdonlyres/CD662F2D–5255–492D–B22D–3876A667C3D8/0/WAISIVGeneralOverview_Feb08.pdf

of 79 (Borderline), a Working Memory IQ score of 74 (Borderline), a Processing Speed IQ score of 86 (Low Average), and a Full–Scale IQ score of 75 (Border-line) [5]. This did appear to be a current and valid estimate of intellectual functioning. There is not a significant difference between verbal and nonverbal abilities. Tr. at 428. Dr. Jones–Thurman's diagnostic impressions were the same as the previous evaluation with the exception that on Axis II, borderline intellectual functioning was diagnosed. Tr. at 431.

Plaintiff and his mother saw Dr. Pierre on May 30, 2009. They expressed concern to the doctor that the Paxil was no longer having the desired effect. Plaintiff said he spends most of his time in his mother's basement where he has everything he needs. When asked why, he said he does not like the feeling he gets when he feels people are looking at him. The doctor was reluctant to discontinue Paxil, and asked Plaintiff to consult a specialist.

On September 17, 2009, Plaintiff and his mother saw Terry Ideker, ARNP for mental health care. His mother said that Plaintiff was a very anxious, nervous person who becomes very stressed when he is around people. She said that she wanted to support her son, but that if he began drinking again, "she feels like she is done." Plaintiff "said it hurts him to make his mother feel so bad and he would like to do the right thing, but says that he is always feeling the itch to drink, because it calms him down." Nurse Ideker agreed to prescribe Klonopin to see if it would help the anxiety, "provided he does not drink for a month." Nurse Ideker gave Plaintiff the phone number of an alcohol treatment pro-

gram and urged Plaintiff to get into alcohol treatment at least on an outpatient basis. The nurse also changed Paxil to Celexa. Tr. at 1023.

Plaintiff saw Nurse Ideker on November 12, 2009. Plaintiff reported being sober for two months which his mother confirmed. The sobriety was facilitated by not having money and by the distance to the store. Plaintiff was in an alcohol program at Heartland Family Service (See, Tr. at 1026–36). He went three times per week with his pastor who is also a recovering alcoholic. Plaintiff also reported pain relief with Neurontin prescribed by Nurse Ideker. Plaintiff was given another prescription for Klonopin with two refills. Tr. at 1014.

On January 28, 2010, Plaintiff told Nurse Ideker that he had an alcohol relapse when some old friends or family members visited him. They had alcohol which he drank. When his aunt and uncle returned home, they chased the people out. Plaintiff's medications were renewed, and Wellbutrin was added. Tr. at 1010.

On January 11, 2011, Nurse Ideker worte a letter on Plaintiff's behalf. Plaintiff's diagnoses, on Axis I, were listed as major depression, generalized anxiety disorder, social phobia and alcohol dependence in partial remission. Because of Plaintiff's history of alcoholism, Nurse Ideker stated there were limitations on the kind of medication which could be prescribed for anxiety. Although he is less anxious with treatment, Nurse Ideker opined that Plaintiff cannot tolerate social interaction and "I do not believe he will be able to live independently, at least for the foreseeable future." It was noted that

---

**5.** There is a statement on page 5 of the WAIS–IV Administration and Scoring Manual that states: "The terms VCI and PRI should be substituted for the terms VIQ and PIQ in clinical decision-making and other situations where VIQ and PIQ were previously used." WAIS–IV Frequently Asked Questions, http://www.pearsonassessments.com/hai/images/products/wais-iv/WAIS-IV_FAQfinal.pdf

Plaintiff tends to hide in the basement and that he does not take pleasure in normal everyday activities. Nurse Ideker explained that Plaintiff's alcoholism stems from the anxiety disorder, and that the anxiety could only be partially controlled with medication. The nurse wrote: "I believe his alcoholism stems from his anxiety disorder. Many people who are anxious and untreated self medicate with drugs and alcohol. Unfortunately, Mr. Pierson's anxiety is very severe and can only be partially controlled with medication." Tr. at 1081.

At the hearing before the ALJ, Plaintiff was asked about his education:

Q. How far have you gone in school?

A. About ninth grade.

Q. Did you complete the ninth grade?

A. I dropped out.

Q. Okay. In my, in the work up sheet apparently at the time that you filed the application or sometime subsequent [your] education was listed as eleventh grade. That's not accurate?

A. They hold me back, they hold me back to ninth grade but I couldn't finish the eleventh grade. But I dropped out before and that stuff came.

Tr. at 32–33.

After Plaintiff testified, the ALJ called Stephen Shill to testify as a vocational expert. Tr. at 57. In response to a hypothetical question which mirrored the ALJ finding of residual functional capacity (Tr. at 58–59), the vocational expert cited the jobs noted in the ALJ's decision. Tr. at 60. When he was asked the effect of the need to lie down and nap throughout the work day, the vocational expert testified that requirement would preclude employment. Id. Likewise, the vocational expert testified that an inability to focus and concentrate for more than 30 minutes at a time, and/or the inability to stand for extended periods of time and walk more than a block would preclude employment. Tr. at 60–61.

## DISCUSSION

■ We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005). *Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008.) In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

In his brief, Plaintiff argued the ALJ overlooked or ignored medical evidence, that he failed to properly consider the opinion of Plaintiff's nurse practitioner,

and failed to perform a proper analysis of Plaintiff's credibility. On the other hand, the Commissioner argued that the ALJ considered all of the evidence in the record, including Plaintiff's credibility to determine his residual functional capacity. The Commissioner also argues that the ALJ properly determined that Plaintiff could perform work which exists in significant numbers in the national economy.

While the Court does not disagree with Plaintiff's arguments, the final decision of the Commissioner is not supported by substantial evidence on the record as a whole because of error at the third step of the sequential evaluation.

In *Shontos v. Barnhart,* 328 F.3d 418, 424 (8th Cir.2003), the Court observed that the Commissioner's instructions, found in the Program Operations Manual System (POMS) § DI 24515.056, for determining medical equivalence states that listing 12.05C is equaled when there is an IQ score which falls between 70 and 75 in the presence of another severe physical or mental impairment. *Id.* at FN 7. The Court held that substantial evidence on the record as a whole established that Shontos' borderline IQ along with other severe impairments entitled her to an award of benefits. *Id.* at 427.

Plaintiff's IQ was established by psychologist Jones–Thurman. As noted above, Dr. Jones–Thurman saw Plaintiff on two occasions at the request of the Commissioner. On the first occasion, the psychologist raised questions about Plaintiff's intelligence based on her mental status examination. Thereafter, Plaintiff was sent back for the administration of the Wechsler Adult Intelligence Scale—Fourth Edition which confirmed her observation and provisional diagnosis. The testing resulted in a full scale IQ score of 75.

In his decision, under the finding that Plaintiff does not meet or equal a listed impairment, the ALJ, at first, uses the phrase "meets or medically equals" several times. See, Tr. at 12. However, as the ALJ compares Plaintiff's situation to those required to meet the listings considered, he stops his analysis after finding that Plaintiff does not meet the criteria for sections 12.02, 12.04, 12.05, 12.06, 12.08, or 12.09. The ALJ never goes on to consider a medical equivalency. See, Tr. at 12–14. In pertinent part, the ALJ wrote:

Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. In February 2009, the claimant underwent a consultative psychological evaluation performed by Dr. Rossana Jones–Thurman.... During this evaluation, the claimant was administered the Wechsler Adult Intelligence Scale–Fourth Edition in which he earned a Verbal Comprehension IQ score of 80, a Perceptual Reasoning IQ score of 79, a Working Memory IQ score of 74, a Processing Speed IQ score of 86, and a Full–Scale IQ score of 75.... *Because the claimant does not have valid verbal, performance, or full IQ score of 60 through 70, the criteria of 12.05C cannot be met.*

Tr. at 13–14, emphasis added.

Listing section 12.05, mental retardation, in pertinent part, provides:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.

* * *

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical

or other mental impairment imposing an additional and significant work-related limitation.

In *Maresh v. Barnhart*, 438 F.3d 897 (8th Cir.2006), Maresh claimed to meet the requirements of section 12.05C of the mental impairment Listing. The Court wrote that in order to meet the Listing, three things must be shown: 1) a valid verbal, performance, or full scale IQ of 60 through 70; 2) an onset of the impairment before age 22; and, 3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Id.*, at 899. Maresh argued that he need only show the 1st and 3rd requirement in order to meet the Listing. The Court disagreed. Addressing the evidence in the record before the Court regarding the second requirement—an onset before age 22—the Court wrote:

Although the ALJ did not address the issue, the record indicates that Maresh's mental retardation initially manifested itself before age 22. Maresh struggled in special education classes through the ninth grade, and then dropped out of school. The Commissioner concedes that Maresh had trouble with reading, writing, and math. In addition, Maresh emphasizes his verbal IQ score of 70, recorded at age 37. True, the score was recorded after the developmental period, but "a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning." *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir.2001); *see also* 65 Fed. Reg. 50,753 (2000) (explaining that the regulations "permit us to use judgment, based on *current evidence*, to infer when the impairment began.")(emphasis added). Maresh also exhibited deficits in adaptive functioning at a young age, when he had frequent fights with other children. Based on the substantial evidence, the ALJ should have found that Maresh's impairment

manifested itself during his developmental period.

*Id.* at 900.

In the case at bar, Dr. Jones–Thurman tells us that Plaintiff had academic problems and was in special education, and that he had behavior problems. Plaintiff testified that although he was in school through the 11th grade, he was never able to complete the work required to finish 9th grade, so he dropped out of school.

Evidence of deficits in adaptive functioning before age 22, is found in the diagnoses of Antisocial Personality Disorder. According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM–IV–TR), "The essential feature of Antisocial Personality Disorder is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." *Id.* at 701.

For this diagnosis to be given, the individual must be at least age 18 years ... and must have had a history of some symptoms of Conduct Disorder before age 15 years ... Conduct Disorder involves a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated. The specific behaviors characteristic of Conduct Disorder fall into one of four categories; aggression to people and animals, destruction of property, deceitfulness or theft, or serious violation of rules.

*Id.* at 702. The fact that Plaintiff was convicted of a crime which resulted in his imprisonment, would not, in itself, result in the diagnosis of antisocial personality disorder. A possible differential diagnosis might have been Adult Antisocial Behavior, a diagnosis which can be given when criminal activity "or other antisocial be-

havior ... comes to clinical attention but that does not meet the full criteria for Antisocial Personality Disorder. Only when antisocial personality traits are inflexible, maladaptive, and persistent and cause significant functional or subjective distress do they constitute Antisocial Personality Disorder." *Id.* at 705–06.

Plaintiff was diagnosed with Antisocial Personality Disorder. *E.g.* Tr. at 424, 431. The ALJ found that Antisocial Personality Disorder was a severe impairment. Tr. at 11. Therefore, there can be no question that deficits in adaptive functioning were present prior to Plaintiff's 22nd birthday.

As stated above, Plaintiff's counsel pointed out that the disability report, found at page 190 of the transcript, states Plaintiff did not attend special education. At hearing, counsel said this was evidence that Plaintiff had not shown deficits in adaptive functioning before age 22. Although the unsigned disability report may be some evidence, when it is weighed against Dr. Jones–Thurman's report, Plaintiff's own testimony on the subject, along with the diagnosis of Antisocial Personality Disorder, the disability report does not constitute substantial evidence on the record as a whole upon which to base a denial of benefits. *See Gavin v. Heckler,* 811 F.2d 1195, 1199 (8th Cir.1987) (The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.) *citing Universal Camera Corp. v. National Labor Relations Bd.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The Court in *Gavin* went on, "Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Id.*

In the opinion of this Court, substantial evidence on the record as a whole, supports a finding that Plaintiff's borderline IQ along with deficits in adaptive function-

ing were manifested prior to age 22. Likewise, there is no question that Plaintiff suffers from other severe impairments which satisfy the 3rd requirement of the Listing.

As in the case before this Court, the Commissioner argued that Maresh could not meet a listed impairment because he had been able to work in the past. Addressing that argument, the Court wrote:

> ... "[t]he issue is not whether the claimant can perform gainful activity; rather, it is whether he has a[n] ... impairment, other than his conceded mental impairment, which provides significant work-related limited function— in other words, whether the second prong of § 12.05(C) is met." *Sird v. Chater,* 105 F.3d 401, 403 (8th Cir.1997) (reversing ALJ's denial of benefits for a claimant who met Listing 12.05C).

*Id.* at 901.

As explained above, the issue here is not whether Plaintiff's impairments meet the requirement of Listing 12.05C, but whether they are medically equivalent. Substantial evidence on the record as a whole—considering both the evidence which supports the Commissioner's final decision, as well as the evidence which detracts therefrom—supports a finding that Plaintiff's impairments do, in fact, equal the Listing. At the conclusion of *Maresh,* the Court wrote:

> Because Maresh meets Listing 12.05C, he is entitled to benefits. *See Jones v. Barnhart,* 335 F.3d 697, 699 (8th Cir. 2003) ("If the claimant wins at the third step (a listed impairment), she must be held disabled, and the case is over.").

*Id.* at 901. In the case at bar, however, there is another wrinkle which must be addressed.

Because the ALJ did not find Plaintiff disabled, he properly did not consider

whether or not alcoholism or drug abuse is material to the finding of disability. In the opinion of the Court, such an analysis is necessary because of Plaintiff's extensive history of polysubstance abuse which the ALJ found to be a severe impairment.

In *Brueggemann v. Barnhart*, 348 F.3d 689 (8th Cir.2003), the Court discussed in detail the procedures which must be followed in the evaluation of substance abuse impairments under the 1996 amendments to the Social Security Act. Under these amendments, applications must be denied if alcohol or drug abuse comprise a contributing factor material to the determination of disability. The claimant bears the burden of proving that alcoholism and/or drug abuse is not a contributing material factor. However, the ALJ retains the duty to fully and fairly develop the record. If it cannot be determined if substance abuse disorders are a contributing material factor, the claimant's burden has been met and an award of benefits must follow. *Id.* at 693. The ALJ is required to evaluate such claims using the five step sequential evaluation described in 20 C.F.R. § 404.1520 without segregating out any effects that might be due to substance use disorders. "The ALJ must base this disability determination on substantial evidence of Brueggemann's medical limitations without deductions for the assumed effects of substance use disorders. The inquiry here concerns strictly symptoms, not causes, and the rules for how to weigh evidence of symptoms remain well established." *Id.* at 694.

If the gross total of a claimant's limitations, including the effects of substance use disorders, suffice to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent. *Pettit v. Apfel,* 218 F.3d 901, 903 (8th Cir.2000); 20 C.F.R. § 404.1535(b)(2). We have previously noted that when the claimant is actively

abusing alcohol or drugs, this determination will necessarily be hypothetical and therefore more difficult than the same task when the claimant has stopped. *Pettit,* 218 F.3d at 903. Even though the task is difficult, the ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other.

Only after the ALJ has made an initial determination that 1) Brueggemann is disabled, 2) determined that drug or alcohol use is a concern, and 3) obtained substantial evidence on the record showing what limitations would remain in the absence of alcoholism or drug addiction, may he then reach a conclusion on whether Brueggemann's substance use disorders are a contributing factor material to the determination of disability. If this process proves indeterminate, an award of benefits must follow. The alternative procedure adopted by the ALJ in this case remains inconsistent with the regulations binding on claimants, the ALJs, and this court. The ALJ's decision reflects legal error.

*Id.* at 695–94.

 Substantial evidence in this record establishes that Plaintiff fights a daily battle to remain alcohol and drug free. He has followed the advice of his physicians at the University of Iowa and in his home town. There is no evidence in the record to support a finding that abstinence from drugs and alcohol will render his other severe impairments, some of which predate this substance addiction, less disabling. Nurse Ideker explained that Plaintiff may have turned to alcohol in order to self medicate his anxiety disorder. Although a nurse practitioner is not an "acceptable medical source" as defined in 20 C.F.R. § 404.1513(a), such a professional meets the criteria of "other medical

sources" who are appropriate sources of evidence regarding the severity of claimants' impairments and the effect of impairments on the ability to work. *See Shontos v. Barnhart*, 328 F.3d at 426. There is no substantial evidence in this record to support a finding that Plaintiff would be able to work in the absence of alcoholism and drug abuse. In fact, the evidence shows that since he has been abstinent, he is more isolated than ever, spending most of his time alone in his mother's or grandmother's basement.

Alcoholism and/or drug abuse is not a factor material to a finding of disability in this case. Nevertheless, the Commissioner would be well advised to assist Plaintiff with the services of a representative payee so that the disability benefits do not become a means to begin abusing alcohol in the future.

## CONCLUSION AND DECISION

The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing text noted in *Gavin v. Heckler*, 811 F.2d at 1199 (8th Cir.1987), and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole and is based on legal error. This case is reversed and remanded for an award of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406B), and LR 54.2(b)[6]. *See also,*

*Gisbrecht v. Barnhart*, 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart*, 376 F.Supp.2d 916 (S.D.Iowa July 15, 2005).

IT IS SO ORDERED.

---

6. N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the gov-ernment in the case that the applicant alleges were not substantially justified."